May it please the Court, my name is Steve Berman and I represent the plaintiffs in this case. I'd like to start out with Rule 23A and I'm going to move to the Rule 23B issues. As to the motion for class certification and Rule 23A, when we made that motion, we followed the line of cases starting with the Teamsters case, the Robinson case from the Second Circuit, and many other cases we've cited and we sought to demonstrate through the use of statistical evidence, anecdotal evidence, and Boeing's own admissions that significant disparities existed between the treatment of men and women. Our expert, whose testimony was admitted by the trial court, found a deviation of over two across the board and the deviations were 2.45 to 8.52, which is whopping in terms of statistical significance. Let me ask you this. What's the employment practice that you're seeking to enjoin or to declare invalid? Well, let me argue that in two parts. It depends on what claim you're focusing on. Well, as I understand your complaint, or at least the motion that you filed for class certification, I thought you principally relied upon a disparate impact theory regarding Boeing's compensation scheme that apparently allows too much discretion in the setting of either salaries or raises for employees, which has an adverse impact on women. Now, there's also references in your paperwork to disparate treatment. The focus, I thought, seemed to be on disparate impact. Well, the focus was on both. I mean, the case law in this case. But I'm asking, but I want to know, but I want, for purposes of determining whether or not a case should proceed as a class action, it's important to understand exactly what your, what the practice is you're seeking to eliminate or to enjoin. And it's a little bit different. What you alleged in the district court, the way you laid it out in the district court, is a little, is different than the way you laid it out here in your brief to us. Well, I don't think it is. With respect to the disparate treatment claim, which was a focus of our motion in the district court and which is a focus of our appeal here, we don't need to. Disparate treatment? Disparate treatment. We don't need a practice. That's all we have to show is that the effect of the operating procedures or practices at this company creates statistically significant. Well, what practice? Disparities. You just said that the effect of the practice. If you look at. At this company, what practice are you talking about? The day-to-day setting of compensations. If you look at the Teamsters case, all the government came in with was statistical evidence backed by anecdotal evidence. There was no identification of any specific practice. And, in fact, the Court said, do you look at whether the result of the company's operating procedures as a whole, for whatever reason, is creating a pattern of practice of discrimination? If statistics show that, and if it's backed by anecdotal evidence, something is wrong at that company. You don't have to identify the practice. Well, sure you do. You're just going to issue an injunction? No. Then, then. If you're going to. Your claim is that this case is an appropriate case for certification, for class certification under 23A and 23B2. Now, in order to get an injunction, you know, you need to be able to frame the injunction, tailor it to the offending practice. So you just can't say, well, in your day-to-day world of setting compensation, I'm going to, we're going to enjoin you. No. What is it that you want enjoined? I want to enjoin a number of things. Well, tell me what's the top thing you want enjoined? The top thing would be to reduce the unbridled discretion or subjectivity that permeates compensation decisions. Okay. So Boeing, you cannot utilize unbridled discretion. Well, it has to be checked. For example, in the Beck v. Boeing case, there's a 43-page consent decree. Most of that consent decree deals with provisions and remedies designed to figure out how you double-check and monitor to make sure that if you're going to have a complete discretionary standard, that there's some accountability. Now, you asked me what the policy was. Again, if you look at the Teamsters case and the Beck case, there was no policy identified with respect to disparate treatment. But with respect to disparate impact or treatment, if the court believes there's a policy, I gave you an example of a policy. I hope the clerk passed it out. But this is from the record. And what it says is there's a single wide company compensation philosophy. And it notes that although this is sometimes called different things for different payrolls, they're not unique. This can sometimes create the false impression of differences when none exist. All are based on a single salary management, the whole company. Now, the trial court found, well, there's all these differences, but the company's own documents say we have one philosophy. And what's that philosophy? It goes on to say that you establish appropriate salaries based on each individual's contribution. That's it. And that leaves it up to each manager to decide, within his or her discretion, have you made that decision? So is that disparate treatment or disparate impact? How do you prove that? You can identify the ultimate requirement under Title VII is you're still going to have to prove a discriminatory treatment of women. And you can get there in different ways. The disparate treatment approach. That's correct. And this gets us both. All right. Because, again, the treatment is you're looking at not in a disparate treatment case each individual female employee's circumstances. You come in with a pattern of practice and show it as a primate facer case, a Phase I liability, that there was a disparity through statistics and anecdotal evidence. And then the burden shifts to the defendant. In an impact case, you follow the same approach. But here what we have is what I've given you is a facially neutral policy that we claim through the use of statistical evidence and anecdotal evidence and the company's own documents identifying this. Let me ask you, so then this policy, they adopt, so if it's disparate treatment, then your claim is that they adopted this policy with the intent to discriminate against women. Or they perpetuated the policy that had the effect of discriminating against women. You still have to have, for disparate treatment, you still have to prove intent. That's right. And we put before the trial court, and it's in the record on the briefs, that this company studied the problem, identified that there were statistically significant disparities between male and female employees, and did not correct the fundamental way that salaries are set. I'm not, I saw those documents. Where are they from? What are they? The studies? Right. They're internal studies that Boeing did to try to find out whether there was a problem and what was causing it. Right. And to remedy it, right? To partially. Well, to remedy it, the answer is no. They studied it. They did what we would call a Band-Aid approach. But if you look at doctor statistics, after they changed some, after they gave some monetary compensation to female employees, they raised salaries, there are still statistically significant disparities. This isn't a class question, really. It's more a merits question. But I don't know how you could prove disparate treatment intent against a company that's clearly studying a problem and trying to fix it, even though they're not doing it perfectly. Isn't that demonstrating the intent to try not to have this disparate treatment going on? Well, actually, if we're going to argue the merits, the documents talk about let's not let people know what we found. Let's make sure that we don't pay the full amount because we have big exposure here. So they go ahead and raise the salaries to a tiny, tiny bit. So perhaps people don't notice as much. To me, that's the worst kind of intent. It's a cover-up. Okay. Let's go back to the class. Paragraph 85 of your complaint lists ten types of discrimination against women. Now, how are you going to identify whether any individual either has been subject to this or not subject to it or belongs in the class or doesn't belong in the class? The only the motion only focuses on discrimination and compensation. Okay. And the way that you proceed in a discrimination and compensation case, as I've outlined earlier under Teamsters and as recognized by the court in Beck v. Boeing, recognized by this appellate court, is you go in with statistical evidence. You don't focus on each female employee. This is another problem, though, because Beck just involved the Puget Sound plant. And what you're doing here is you're suing five different plants that do different things and produce different products, and some don't even produce products. But perhaps you should have considered subclasses, as they did in Beck. Well, we didn't consider subclasses for two reasons. One, in the Beck case, it involves just not one plant. It involves multiple facilities in Puget Sound. There's facilities at Everett, at Renton and other locations, different plants. Two, we had the benefit of the Staten v. Boeing opinion, opinion not even discussed by the trial court, in which the Ninth Circuit approved certification of a Boeing class of African-Americans at every single site in the nation. We're talking about hundreds of sites. So given that authority, which is based on the same compensation philosophy How do you deal with the statement in that opinion by Judge Brisson? She said, well, you know, given the discretion here, it would have been okay for the district court to have denied class certification, given the discretion that it has. But here it chose to certify so. Well, in that case, I think, given the breadth and the arguments were made about the different policies at different locations, and, you know, perhaps the court could have said, well, I could see why you don't want to do the whole nation. Here we have a very small subset of Boeing that's governed by one policy, the policy I put before you. And the trial court here did not engage in the proper analysis. Well, the trial court here, I know, I read the argument before the district court, the whole whatever it was, 130 pages. But, you know, one of the things that concerned the trial court was that you may have these defined plants here in Southern California, but you have a wide variety of job classifications. Well, but I think the courts have said the company itself, when it studied in the documents I referred to where it reported there were problems, they didn't study these based on job classifications. They understood that there was a single philosophy that governed compensation, and they studied what they call the root causes of disparities as a whole. Well, they pointed out, you know, in the argument they pointed out, I'm sure we're going to hear the same argument here this afternoon, but, you know, you have engineers at one level at the high end who, you know, maybe subjectivity is an important factor to utilize in determining salary and salary rates. Well, that rate. At that high end level. But perhaps down at the lower end level you can or should set salaries based on some clearly objective criteria. Well, that. How do you deal with that disparity? There is no disparity in terms of statistics. I mean, Dr. Siskin looked at the engineers as a whole and found statistical disparities for the engineers as a whole. That's the, in his opinion, the appropriate level to analyze discrimination because if you get too small, the cases are. Is there any literature that subjectivity in setting compensation or determining about subjectivity that women or minorities are adversely impacted by subjectivity? Well, there's literature cited in two cases, the Watson case and the Robinson case, and those cases talk about how subjective decision-making, although not per se illegal, can lead to discriminatory bias. And one of the things you look for to determine if that's the case, which was present here, was other evidence of discriminatory impacts, and that's where the statistics come in. If you take those two, under the Watson case and the Robinson case, I think the Court abused its discretion in saying that criticism, I mean, subjectivity is just criticism and can't be a policy that can give rise to. Well, that seemed to have been wrong. I mean, under Watson it's clearly subjectivity can be an employment practice that is. That's correct. That is impermissible under Title VII or can be impermissible under Title VII. So on that score, I think it's clear there should be a remand to reconsider that subjectivity issue under the proper standard, because the wrong standard was applied. And that takes me to the B-2 issue. Actually. Can I just follow up on it? I don't know if it's a follow-up, but you have a certain number of defiant clients who came to you with a concern, retained you and asked you to seek redress, I presume. That's correct. And you looked at the situation and concluded that maybe there's more out there. And so you wanted to proceed by way of a class action. And I'm just curious, why do you, other than those who specifically come forward, why do you presume that there are others who are concerned or seek redress? That's not how this case arose. That's a good question, but there's an interesting factual backdrop that one of the judges touched on. This case was originally part of a class action in the Puget Sound. The plaintiff's lawyers in that case had presented the statistical evidence that's before this Court, by and large, in that case. When the Court refused to certify a nationwide gender case and broke it up into a Kansas case, a St. Louis case and a California case, I had the benefit of the evidence that showed it was not just limited to a couple of female employees in California or Kansas. And therefore, when I saw that, it seemed clear to me that they should proceed  And I'm just curious, why do you presume that there are others who are concerned  Because you have a fairly large group of people that you will – that there's a large number in the class that – Well, I think we've identified, by number of employees in a statistical report, it's 3,000. Okay.  Thank you. May it please the Court, my name is Neal Mullen. I'm here on behalf of the appellees. I have to say, after I read the briefs, after the briefing was completed, I thought how exciting it would be to be involved in a case that would resolve novel questions of constitutional due process law, Seventh Amendment law, open questions on notice or B-2. But quite frankly, we believe that this case should be resolved on a far less grandiose basis. The question before the Court now really relates to the authority of a district judge to deal with a record that's performed and the scope of discretion, the scope of authority that that judge has. The question is not, we believe, exclusively whether the judge could have, as Judge Paez said, could have certified on this record. We believe that he could not have, and I'm happy to explain that in whatever detail Your Honors would like. Well, it seems like if they could have and they did in the, what is it, the Stanton case, it seems to me that here, had he certified the class here, you'd be in a tough situation. Well, you know, I think that Your Honor has already pointed out one of the fundamental distinctions, or maybe I should say similarities between the two cases. Because I think both Stanton and Gross are standards of discretion or standards of authority cases. The Ninth Circuit panel in Stanton said, we're very troubled by the ambitious scope of the commonality questions, that is, the ambitious scope of the class. We're troubled about how this case would get tried if it were really going to try trial. And we want to emphasize, the authoring judge said, we're stressing that we're operating under the abuse of discretion standard. Given the scope of authority that has to be given a district judge to deal with its docket, deal with the case before it, and to determine the questions under 23A, we can't say that the district judge abused his discretion. Now, I'll also point out one fundamental distinction between the two cases. As Your Honor pointed out, in this case, we have a grand total of eight declarations from Boeing employees supporting the motion for class certification. In Stanton, the appellate panel was very impressed with the fact that class counsel had interviewed 1,300 members of the putative class and had submitted detailed documentary and testimonial evidence from 200 of them. And the court said those individuals were drawn from such a broad cross-section, we don't believe the district judge abused his discretion when he granted class certification in that case. Now, it's true that when a district judge is addressing a motion for class certification on a stipulated record, that the adequacy of representation issues are particularly important and that they bear particular scrutiny. And I think that's the lesson that we draw from Stanton. But we also have to understand that the record that was before the district court in Stanton was a stipulated record. The parties had stipulated to the motion, had agreed that the class should be certified, and therefore, when the court exercised due diligence to review the record and put before them. In this case, the record was developed in the adversarial process. And what the district judge saw here was not Watson, 80 employees, one woman who wanted to go from a teller position to the supervisors of tellers. They got one move, 80 employees in the entire company. There are hundreds of job classifications at issue here. As Your Honors have already noted, they go from security personnel to acousticians to interior designers. Now, I don't know how Boeing is supposed to design an evaluation and compensation system that bleeds the subjectivity out of the judgment as to whether the interiors of their aircraft are attractive or not. Now, the most remarkable thing I believe that came out of counsel's argument was this. And I hope that I got this correct, that with respect to either the disparate treatment, well, with respect to the disparate treatment claim, we don't need a practice. And he cited Teamsters for that. But Teamsters was not a Rule 23 case. It was brought by the government. Rule 23 doesn't apply. Either in a disparate treatment or in a disparate impact context, this Court must identify, the district court had to identify something that united them. It can't be, Your Honor, that all a plaintiff needs to do is find an exit. Well, you know, Watson outlines, at least for purposes of a disparate impact case, Watson outlines the sort of approach one should follow. There is no question there. There's no question there. But then in Watson, they say that that subjectivity can be an improper employment practice. It's just not criticism. It can be a practice that offends Title VII. Judge, I couldn't agree more with that. And I don't think that But you seem to have, you know, the way you approached it with the district court, you seem to lead him down the wrong path. Oh, I hope not. I wonder how that language, and I don't accept that a district court judge cannot adopt a proposed ruling that's been drafted by a particular party. But I wonder how that language got in that order about excessive subjectivity is not an employment practice, because that's just dead wrong. Well, I think there are two points to make there. First of all, that language came from the minute order that the district judge drafted by himself. I understand that came from the minute order. I saw in there, but that's an incorrect statement of the law, that you could have chosen, knowing that you are well-versed in this law, you could have chosen not to incorporate into the opinion. I will grant you, Your Honor, that I wasn't disappointed when I saw the language. But let me simply say that I think that it would be very easy to divorce that language from the context of the case. And if one were to do that, it would be an error of law. Watson tells us that under certain circumstances, unbridled discretion and subjectivity can be a practice. But remember what happened in Watson. Eighty employees in the bank total. Teller moved to supervisor of tellers. No standards. None. No combination of written standards, objective standards, and subjective ones. No standards. It was left up to the president of the bank to decide who ought to be promoted, and that's it. And it was in that context that the Court said, of course, this can be a practice attackable under a disparate impact analysis. What about this philosophy that counsel for the class, proposed class, cites about that seems to expressly incorporate some kind of subjective analysis into the size of raises? Well, I'd like to say two things about this document. There's no question, Your Honor, we have never doubted. And in fact, it's in both our district court and our court of appeals briefs, that there is a common compensation philosophy applicable to all Boeing facilities. That philosophy is you pay your best people the most. You don't discriminate. It is the most hortatory and sort of high-level philosophy. And it applies to everybody. But you can't apply that in the same way to a fluid dynamics Ph.D. and somebody who's answering the helpline telephone calls. Now, the most important thing I gleaned from this document is that in the district court, as Your Honor pointed out, the plaintiff's theory was excessive subjectivity, unbridled discretion. Well, it's not unbridled, but that's a merits question. But that's the allegation. We take that pretty much. For four hours, in their reply brief, they say, well, it was unfair of the district judge to limit us to 25 pages. We never really got around to the four specific practices that we believe unite the whole class throughout the class period and across the entire class. Unfair of the judge to limit us to 25 pages. But we had four hours in front of the judge. And I read that transcript three times. I read it on the plane yesterday again. You will not find uniform fund generation, raise management, real-time adverse impact analysis. You will not see one of those elements mentioned in four hours of oral argument. Now, the remarkable thing about this document is that when we were in the district court, Mr. Berman submitted a declaration that expressly said, and it's quoted on our brief, that Boeing relies on salary management, not raise management. Raise management's evil. Salary management, good. That's what we had in the district court. In the court of appeals briefs that are before Your Honors, when pressed to identify the specific practice that binds the class together in some way, they said, oh, it's that evil, raise management. That's what Boeing does. They use raise management, and it redounds to the detriment of women. But what do we see of oral argument in the court of appeals? We're back to salary management again. Your Honors, when we talk about the abuse of discretion standard and what is expected of a district judge that's dealing with four boxes worth of materials, it's just fundamentally unfair to play a game of three-card Monty with the district judge and castigate the district judge for failing to appreciate the importance, the centrality of four specific practices that aren't in the brief and were never mentioned in four hours of argument. That's just fundamentally unfair to a district judge. That's what happened here. Now ---- Was the district court's opinion published? Excellent question, Your Honor. I don't believe it was. I don't know. I don't think that it was. I think it appears in not Westlaw, but what's the other one? Lexis. I think everything appears someplace these days. I don't believe that it's in the West Federal reporter system, Your Honor. But, I mean, I think that one of the focuses of Mr. Berman's argument here was the statistics, and I wanted to have you ---- Well, how do you count for the ---- I was just going to ask you. This is my next question. How do you ---- What do you put your response to the statistical disparities? Because I think ---- I find them troubling. Well, I'm sure there's a, you know, deep down there, Boeing has an explanation, but ---- Well, there are a number of explanations. But they are troubling. Many of which go to the merits, and I don't believe that that's particularly instructive. Although, as we argue in our brief, there are times when the Rule 23 questions and the merits questions overlap to a degree that the district judge has no alternative. You're seeking to understand what the plaintiff's case is about. Well, and you're also seeking to find out what binds them together. Again, it's ---- Plus, what's the case about? Right. Right. And that goes back to Mr. Berman's comment that we don't need a practice for a disparate treatment claim. But if you don't have something that binds the class together across the class period and across the class functionally, then what gets tried? Well, he's saying that the statistics bind them because the statistics demonstrate a gender disparity in salary. And so that's what binds them. They're all suffering under this system. But, you know, in some respects, Your Honor, that's a tautology. It's Mr. Berman saying that the common issue is whether we win. We've got statistics that say when we get to trial, we'll win, and therefore, there's a common issue. And the common issue is whether we win when we get to trial. It's awfully circular. Let me address, though, your question, Judge Paez, as to how I address the statistics. The plaintiff's expert in this case, Dr. Siskin, and by the way, the only expert report that the district judge considered was Dr. Siskin's. This is not, as plaintiffs claim, a battle of dueling experts. Dr. Siskin performed two different analyses. One analysis I'll refer to as a merits analysis, and it's the one that, Judge Paez, you say gives you pause because it rolls all of these various jobs up and all these various locations together, and he comes up with these statistically significant disparities. I could bend your ear about why that analysis is wrong, but that's a merits question. When Dr. Siskin was examined in deposition about that analysis, he said two things. First of all, I was asked to assume commonality. And secondly, that analysis, the one that I just described, masks the existence, commonality, because it homogenizes, it compresses all of these disparate groups. If one is going to determine whether in fact there is commonality, the analogy we used in our brief was whether you were going to determine in a block on which there was a public library whether large libraries or large collections of books were common. Now, if you do an average, you roll them all together, you divide by the number of houses or buildings on the block, and on average, there's a huge number of books in each one of those buildings. But we know that you can't determine commonality that way. You can't find out whether large book collections are common by adding them all together and then doing an average, which is what that analysis did. In order to decide whether those collections are common, you need to look at each one discreetly. First building, no. Second building, no. And then at the end of the day, you can conclude whether large libraries are common on that block. In this case, Dr. Siskin looked, for example, at the year 2002. He looked at what he called job aggregation groups. Actually, it's a terminology that came out of a negotiated resolution with the OFCCP. But he looked at broad cross-sections of jobs. He looked at them in each year, and he looked at them in each location. There were 126 cells, if you will, year, location, job, aggregation group, 126 cells, two of them adverse to women in a statistically significant way, three of them statistically significantly adverse to men. If you take the entire period, you add up all the cells, and you look to see how many were statistically significant in either direction, it's 14 percent. Eighty-six percent of those cells were not statistically significant in any direction. If you're trying to determine commonality, that's what you have to look at. There is no common problem. There may have been, if you accept his methodology, which we don't, and you accept all of the other underpinnings of his report, which we don't, there may have been a problem in the 14 percent of the cells in which there were statistically significant disparities. But you simply can't say that that problem was common across the class period and functionally across the very disparate groups in Southern California. And I seem to have exceeded my time. I just have one or two other minor questions for you. But if you were to take the commonality prong of 23A, you know, our case law is pretty generous. It's kind of basically permissive, and we don't apply a rigid test. You know, if you have a common practice here that is applied to, you know, to different categories, that doesn't necessarily mean that commonality fails. There's no question that that's true, Your Honor. And if I can point to an opinion that I think deals with this very knowledgeably and directly, it's the Donaldson against Microsoft case coming out of the Western District of Washington in which the court said if there is a common practice, for example, if you have our acoustical engineers and our interior designers and our security people and they were subject to the same benefits policy, for example, the sex-oriented mortality tables that were issued in probe, it wouldn't make any difference that these people do different jobs. It would be completely irrelevant. But if the question is did you pay your interior designers correctly, is there too much discretion and subjectivity in paying your interior designers or your security staff or the help desk people or the fluid dynamics PhDs or the people who work in the top secret black box operations in the phantom works, whether each one of those was unbridled or too subjective, there's nothing that binds them together. There's no common practice. In order to show that there was too much discretion with respect to the interior designers, you'd have to have testimony about the interior designers. And if you're going to do that by each job title, where is the efficiency? Where is the – which is the animating purpose of Rule 23 is that you're supposed to have some overarching facts that are sufficiently uniting the class, especially under B2, and we haven't talked at all about B. You're supposed to have – the mandatory B2 class is supposed to be so cohesive and the rights of individuals and the situations of those individuals is supposed to be so unifying that the story of one is the story of all. That's just not the case here. That's why in our view it would have been an abuse of discretion for the court to certify a class. But, my Lord, it simply cannot be that the district judge here abused his discretion when he said, unworkably diverse. This is just too disparate. These people do too many different things in too many different places. The statistics are all over the map. There's no class here. MS. GOTTLIEB Did you have one other question? MR. BOUTROUS No, I don't. I had just one little question. I bet you don't know the answer to this, but we'll try it. MR. GOTTLIEB A test. MR. BOUTROUS The eight persons who actually filed declarations in this matter, do you happen to know if they were held jostly in the category that – where there was a 14 percent – you said there was 14 percent disparity. I'm just curious whether those eight persons happen to be within that category. MR. GOTTLIEB There is – MR. BOUTROUS Do you understand the question? MR. GOTTLIEB I do understand the question, and that is knowledge that I had at one time, and if I were a younger man, I probably would have retained it. My recollection, Your Honor, is that it was mixed bag. MR. BOUTROUS Some words. MR. GOTTLIEB Some of them worked in cells that at least in some years in Dr. Siskins' report showed a statistically significant disparity. But it's interesting, and I hope Your Honor will permit me 30 seconds or 20 seconds on this. The same cells didn't show statistically significant disparities even in Dr. Siskins' report year to year, so that in one year it was plus 2.3, and the next year it was below zero, you know, favorable to women. The next year it was back at 1.0. It was all over the map. Again, when you look at that display, the district judge had to look at that and say, what am I going to try here on a classified basis? And it can't simply be do plaintiffs win. MS. GOTTLIEB All right. Thank you. MR. BOUTROUS Thank you, Your Honor. MS. GOTTLIEB You only had 20 seconds, but I'll give you a couple of minutes because counsel went over, too. MR. BOUTROUS Thank you very much, Your Honor. Mr. Bowen says you don't get to get to all the interesting intellectual issues because there's no abuse of discretion. And I beg to differ. It's an abuse of discretion to have decided the B-2 class on a wrong standard in a statement of the law with respect to subjectivity. That's an abuse of discretion. MR. BOWEN Well, there's subjectivity and there's subjectivity. I'm looking at my initial question to you was where's the – define the practice. MR. BOUTROUS And the practice we've defined in our brief was this single company-wide policy that says do what you want to do. Evaluate each individual's, quote, contribution. That was a practice that was there the entire time. MS. GOTTLIEB What the district court said is the same thing that I think is causing – at least what I hear is causing Judge Paia's trouble. It causes me trouble, too. It's saying – I think that comment on excessive subjectivity was kind of a throwaway thing in his memoir. But he says plaintiffs have not identified any company-wide policy or practice that caused the alleged salary disparity. So he's accepting the statistics. But he's saying you haven't – I don't think you've yet done it today. Identify the company-wide policy or practice that causes the salary disparities identified in the expert report. MR. BOUTROUS And what we put before the court was not only that policy, but we put before it uniform fund generation, it was called. We put before the court – MS. GOTTLIEB Well, wait a second. I read the whole transcript. I didn't see uniform fund generation. MR. BOUTROUS But it was in the briefs. You have to understand the way the oral argument went down. The judge came out and said I'm going to certify this class. MS. GOTTLIEB I understand.  MR. BOUTROUS So we put everything in our briefs. And if the judge tells you you're going to win, you don't spend hours arguing something you think you've already won. MS. GOTTLIEB You spend four hours arguing it. And I have the exact turning point where he said he went from about to certify the class to deciding, whoa, maybe this isn't going to work. MR. BOUTROUS But we put all that material before the court, in the record, all the policies. We identified the policies. And he disregarded the policies. That's an abuse of discretion. At a class certification standard hearing, when you put before the court what you're complaining about, and the court resolves the issue, because Boeing argued there's no policies here. We said there is a policy. All of the documents that we put before the district court. MS. GOTTLIEB Were you asking the court to enjoin this policy that you put before us today, a philosophy of rewarding people based on their contribution? You think the court should issue an order enjoining Boeing from rewarding employees based on their contribution to the company?  BOUTROUS I think what the court should do, and what the court did, and I'm holding the 43-page consent decree in the Beck case. In the Beck case, Boeing didn't say, well, we can't do this because everyone's job is different. We have an interior designer. We have an airplane mechanic. Boeing recognized that they have a single uniform policy, and they could apply the changes to everyone. And some of the changes include, for example, accountability, that there's people who go and check to see that the discretion is being exercised properly, that there's someone you can complain to. They set up an independent review board. If you think you're not being fairly treated, you can go and complain to someone, and there's an investigation process that starts. There's all kinds of things. ROBERTS You want a district court judge to mandate all these practices for Boeing? BOUTROUS Yes. And probably more. That's exactly what the district court judge. ROBERTS Well, a consent decree is far different than a district court judge ordering that kind of review. BOUTROUS Consent decree entered a week before the trial was supposed to start. ROBERTS No. A consent decree is just that. It's a consent. BOUTROUS I understand that. ROBERTS A party consents to it. BOUTROUS And the court maintains supervisory capacity. ROBERTS It's different, though. A consent decree like that is significantly different than a district court judge saying, you're going to do this, you're going to do this, you're going to do this, and you're going to do this, and you're going to do this. BOUTROUS I agree with that. But a district court judge would not. ROBERTS But do you like it or not? BOUTROUS We would make that decision. ROBERTS I'm going to run your employment office. BOUTROUS Yes. And district court judges make decisions like that, as they do in school discrimination cases, after they hear from expert testimony as to what structural remedies would need to be put in place to remedy the discrimination. Now, you talk about statistics being troubling, and counsel said, well, it's only 14 percent. You get to the 14 percent by doing something that the page court says you can't do, and that's to disaggregate the statistics down to a meaningless level. What bound this class together was that at every single job category, in every single year of the class, there were statistically significant disparities. That satisfies Rule 23a, and that's an abuse of discretion.  GINSBURG All right. Thank you, counsel. Gross v. The Boeing Company is submitted, and this session of the Court is adjourned. BOUTROUS All rise. This Court for this session stands adjourned. BOUTROUS Thank you.
judges: Wardlaw, Paez Beistline